IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AFILIAS PLC,                              )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )   No. 1:15-cv-14 (LMB/JFA)
                                          )
ARCHITELOS, INC.,                         )
                                          )
            Defendant.                    )

MEMORANDUM OPINION

This Memorandum Opinion supplements the oral ruling from the bench and provides

additional explanation for the Order issued on January 8, 2016, in which the Court denied the

Plaintiff's Motion for a Status Quo Injunction Pending Entry of Judgment [Dkt. No. 281], Dec.

17, 2015, as moot and granted the defendant's Motion for Judgment as a Matter of Law Or, In

the Alternative, For a New Trial or Remittitur  [Dkt. No. 259], Sept. 8, 2015, only to the extent

that a remitted judgment was entered in favor of the plaintiff in the amount of $2 million. Order

[Dkt. No. 287] at 1, Jan. 8, 2016. The Court also declined to rule on the Plaintiff's Post-Trial

Motion for a Permanent Injunction [Dkt. No. 255], Sept. 4, 2015, to allow the parties time to

meet and confer as to the parameters of an appropriate injunction. Id. The parties attempted to

resolve this issue but were unable to reach complete agreement and have tendered their proposed

injunctions, requesting that the Court resolve the issue. See Joint Status Report on Parties'

Efforts Regarding Proposed Language for Permanent Inj. [Dkt. No. 289], Jan. 22, 2016.

I.      PROCEDURAL BACKGROUND

This civil action began on January 5, 2015, when plaintiff Afilias PLC ("plaintiff" or

"Afilias") filed a ten-count civil action against defendants Architelos, Inc. ("Architelos") and its

co-founder and Chief Executive Officer Alexa Raad ("Raad") (collectively, "defendants"), alleging respectively in Count One, Misappropriation of Trade Secrets; in Count Two, Conspiracy to Injure Another in Trade, Business, Reputation (violation of the Virginia Business Conspiracy Act); in Count Three, Tortious Interference with Contracts; in Count Four, Rights to Patent No. 8,800,044; in Count Five, Rights to Patent Application No. EP 20130158369; in Count Six, Rights to Patent Application EP 20120760627; in Count Seven, Rights to Patent Application CA 2866822; in Count Eight, Rights to Patent Application 13/416,688; in Count Nine, Conversion; and in Count Ten, Civil Conspiracy. With respect to the patent rights, plaintiff sought declaratory judgments that the rights to each patent or application belonged to Afilias.

Defendants originally counterclaimed on various theories, including tortious interference with contract, but later voluntarily dismissed their first and second counterclaims. See Stipulation of Dismissal [Dkt. No. 148], July 9, 2015. Summary judgment was later granted to the plaintiff on the defendants' third and fourth counterclaims. See Order [Dkt. No. 164], July 24, 2015. Before trial, defendant Alexa Raad was voluntarily dismissed, as were Counts Four, Five, Six, and Seven of the Complaint and the defendants' fifth and last counterclaim. See Order [Dkt. No. 223], Aug. 14, 2015.

Plaintiff's remaining claims alleging trade secret misappropriation (Count One), violation of the Virginia Business Conspiracy Act (Count Two), tortious interference (Count Three), rights to the '688 patent application (which the parties refer to as the '801 patent) (Count Eight), conversion (Count Nine), and civil conspiracy (Count Ten) were tried to a jury during a trial that began on August 18, 2015. No counterclaims remained for trial.

During the trial, Afilias presented the expert testimony of Dr. Seth Nielsen ("Dr. Nielsen"), who concluded that the '801 patent held by Architelos "contained the proprietary

2

information from the Afilias abuse tool from 2011" and that "the Afilias proprietary information is embodied in [Architelos'] NameSentry [product]," which is based on the '801 patent. Trial Tr. 377:6-8, 385:25-386:6. Architelos did not present any expert testimony on the issue of misappropriation but presented evidence and testimony that the allegedly proprietary information was generally known in the industry and was disclosed publicly by Afilias. See id. 735:19-764:4.

On the issue of damages, Afilias presented the expert testimony of Dr. Brian Becker ("Dr. Becker"), who based his expert analysis in part on a 2011 or 2012 estimation made by Architelos to potential investors that sales of its anti-abuse products would total $332 million between 2012 and 2020. Id. 437:22-439:5. He then used the concept of a "hypothetical negotiation" to calculate a "reasonable royalty" rate of 29.9% that Architelos could have paid Afilias in order to use its information in the NameSentry product. See id. 438:4-439:21. Dr. Becker testified that as an alternative, Architelos could have bought a "paid-up license" or made a lump sum payment of $48.8 million to Afilias for the information. Id. 470:6-471:8. Dr. Becker also discussed Architelos' actual profits from the NameSentry product, which totaled less than $300,000 to date, and testified that application of the reasonable royalty rate to those profits yielded totals of $99,000 with interest and $93,500 without interest. Id. 441:5-442:21. Architelos did not present any expert testimony on the issue of damages.

During closing arguments, plaintiff's counsel submitted to the jury that it could either measure damages according to the research and development costs Afilias had invested in its semi-automated anti-abuse tool, which the plaintiff calculated to be $1.2 to $1.5 million and described as "the minimum that [Afilias] would be entitled to," or could calculate damages according to Dr. Becker's reasonable royalty rate as applied to the projected revenues Architelos had presented to potential investors, for a total of $31 million. Id. 926:8-928:17. With regards to

3

the latter measurement, plaintiff's counsel argued that the jury was entitled to discount

Architelos' projected revenues, concluded that a 70 percent discount would be reasonable, and

estimated that such a discount would result in a total of $9.4 million in damages. Id. 928:20-

929:15. Based on this reasoning, plaintiff's counsel argued that $10 million would be "an

appropriate number for the value of this tool." Id. 929:20-22.

Before the conclusion of the trial, the Court ruled against Afilias on its claim to the '801

patent and declined to grant a declaratory judgment as to that patent. Id. 890:20-891:2. The jury

awarded plaintiff a total of $10 million ($5 million for the trade secret claim, $2.5 million for the

conversion claim, and $2.5 million for the civil conspiracy claim), but found against the plaintiff

on the business conspiracy and tortious interference claims. Verdict Form [Dkt. No. 240] at 1-3,

Aug. 24, 2015.

## II.   FACTUAL BACKGROUND

Afilias, an Irish corporation headquartered in Dublin, Ireland, wholly owns subsidiaries

in Canada ("Afilias Canada") and the United States ("Afilias USA"), and is a domain registrar

managing the world's second largest domain registry, including the registry for the .info top-

level domain ("TLD").[1] Compl. [Dkt. No. 1] ¶ 2, Jan. 5, 2015; Mem. of P&A in Support of Pl.'s

Post-Trial Mot. for a Permanent Inj. [Dkt. No. 256] at 2, Sept. 4, 2015 ("Inj. Br.").

Defendant Architelos, which also works in the domain industry and manages "new and

existing internet domains," is incorporated in Delaware and headquartered in Leesburg, Virginia.

Compl. ¶ 3. Architelos has three full-time employees and employs approximately six

---

[1] A domain name is "a unique identifier" such as "Google.com" that is used to identify
computers, servers, and websites. Trial Tr. 46:21-47:1. The ".com" part of "Google.com" is
considered a "top-level domain," as is the ".info" portion of "Afilias.info," whereas the "Google"
and "Afilias" portions of those domain names are considered the "second-level domain[s]." Id.
46:7-18.

independent contractors. Answer [Dkt. No. 35] ¶ 117, Mar. 13, 2015. Co-defendant Raad co-founded Architelos in 2001 and serves as the company's Chief Executive Officer. Answer ¶ 117; Compl. ¶ 4.

Although Afilias named only Architelos and Raad as defendants in this action, Afilias' Complaint also alleged that several of Afilias' former employees and contractors functioned as co-conspirators with Architelos and Raad. Compl. ¶¶ 5-9. Specifically, the Complaint named Michael Young ("Young"), who served as the Vice President of Technology at Afilias Canada until he left in February 2011 to join Architelos, id. ¶ 5; Stephen Van Egmond ("Van Egmond"), who as a director and officer of Canadian corporation Tiny Planet Consulting, Inc. ("Tiny Planet") had worked as a software development contractor for Afilias Canada until March 2011, id. ¶¶ 6-7; and Greg Aaron ("Aaron"), the president of Illumintel, Inc. ("Illumintel"), a Pennsylvania corporation, who had worked as an employee for Afilias until June 30, 2011, at which time he left but continued to consult for Afilias through Illumintel. Id. ¶¶ 8-9; Trial Tr. 116:24-117:1, 140:21-141:4.

As to these co-conspirators, the Complaint alleged that each had signed agreements in which they agreed that they would not disclose any of Afilias' proprietary or confidential information, remove it from Afilias' premises, or use Afilias' proprietary information for their own benefit. Compl. ¶¶ 13-15. These agreements defined proprietary and confidential information very broadly.

The evidence at trial showed that Afilias began experiencing abuse problems with the .info TLD. Specifically, in 2007 the Internet security company McAfee released a report listing "the world's riskiest top level domains" in which it described plaintiff's .info TLD as the riskiest TLD in the world. Trial Tr. 63:6-12. Afilias determined that the report's findings were accurate

5

in that the .info TLD faced "a real problem" with "domain name abuse," id. 65:18-22, which includes spamming and other situations "when people with bad intentions take a domain name or a set of domain names and . . . they use it for malicious purposes, they try to grab your information, they try to steal information from your computer, they try to take away your identity, or they use it for illegal purposes [such as] . . . child abuse or child pornography or other things like that." Id. 47:25-49:2. In response to this concern, Afilias formed a team to address "this existential threat to [the] company's primary product," id. 63:14-15, 64:15-65:12, which team included Aaron, Young, and van Egmond. Id. 65:4-5, 89:16-20.

The team's efforts included the development of an anti-abuse tool that combined many data feeds into one and used a filtering system to identify abusive domain names against which Afilias could then take "remedial steps." See id. 83:17-84:13, 120:8-124:23; PX-117; PX-264. Afilias presented testimony at trial that it took the company two and a half years to develop its "first full-scale" working model of the tool. Id. 138:18-25. In September 2011, after leaving full time employment with Afilias but while working as a consultant for the company, Aaron sent Raad a proposal for a product that would combat domain name abuse. Id. 575:5-20, 791:13-792:9. Subsequently, in November of 2011 Architelos executed a three-party term sheet with Aaron and van Egmond to develop such a product. The agreement granted each party a share of the future profits from the product, which was ultimately called NameSentry. Id. 553:12-554:24.

Afilias alleged that Aaron, Young, and van Egmond misappropriated the trade secret and proprietary information they gained through working on plaintiff's anti-abuse tool and then used that information to develop defendant's NameSentry product and to apply for five different European, Canadian, and United States patents in their names and in Architelos' name. Compl.

6

¶¶ 17-18. One of these patents, the '801 patent,[2] became the focus of the litigation. Afilias claimed that the NameSentry product and the '801 patent were derived from (1) Afilias' proprietary "method of taking many abuse data feeds and consolidating them into a single data feed," which plaintiff refers to as the "many-to-one method;" (2) Afilias' method of filtering these data feeds; and (3) Afilias' method of "grouping customized abuse feed data." See Inj. Br. at 1.

### III.   DISCUSSION

In support of its renewed motion for judgment as a matter of law and alternative motions for new trial or remittitur, Architelos argues that Afilias failed to prove the existence of any trade secrets, that the amount of the jury award was not supported by the evidence and is a miscarriage of justice, and that the conversion and conspiracy claims are preempted under the Virginia Uniform Trade Secrets Act ("VUTSA"). Def.'s Mem. in Supp. of its Mot. for J. as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [Dkt. No. 260] at 4-5, Sept. 8, 2015 ("JMOL Br."). Afilias counters that Architelos seeks to re-weigh the evidence and to "sidestep the consequences of a flawed trial strategy" in which Architelos failed to present any expert testimony of its own on either the trade secret or damages issues. Pl.'s Opp'n to Def.'s Mot. for J. as a Matter of Law Or, in the Alternative, For a New Trial or Remittitur [Dkt. No. 269] at 1, Sept. 21, 2015 ("JMOL Opp'n"). Afilias contends that both the jury's finding of trade secret

---

[2] On March 9, 2012, U.S. Patent Application No. 13/416,688 ("'688 application"), titled "Managing Domain Name Abuse," was filed with the United States Patent and Trade Office ("USPTO"), naming Young, Van Egmond, and Aaron as the inventors. Answer ¶ 94; see also Pl.'s Ex. 1 ("PX-1"); Trial Tr. 142:25-143:15. Believing that the '688 application embodied its proprietary information, Afilias attempted to intervene in the prosecution of the '688 application in late 2014. Id.¶¶ 95-107. The USPTO ultimately ruled that Afilias was not authorized to make filings related to the patent and instead issued U.S. Patent No. 8,938,801 ("'801 patent") to Architelos on January 20, 2015, several weeks after this civil action was filed. Id. ¶ 105.

misappropriation and its damages award were supported by the evidence, id. at 2, and also argues

that the conversion and conspiracy claims are not preempted because they were based on

evidence of misappropriation of proprietary but not trade secret information. Id. at 27.

### A. Judgment as a Matter of Law on Liability

Architelos argues that it is entitled to judgment as a matter of law on all counts because

the jury's finding of liability and the damages awarded were not supported by the evidence.

Under Fed. R. Civ. P. 50(b), judgment as a matter of law may be granted after a jury verdict is

returned "only if, viewing the evidence in a light most favorable to the non-moving party (and in

support of the jury's verdict) and drawing every legitimate inference in that party's favor, the

only conclusion a reasonable jury could have reached is one in favor of the moving party." Int'l

Ground Transp. v. Mayor & City Council of Ocean City, 475 F. 3d 214, 218-19 (4th Cir. 2007).

A court ruling on a Rule 50(b) motion "should review all of the evidence in the record" but "may

not make credibility determinations or weigh the evidence" and "should give credence to the

evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is

uncontradicted and unimpeached, at least to the extent that that evidence comes from

disinterested witnesses.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51

(2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d

ed. 1995)). Although the court must "accord the utmost respect to jury verdicts," it must reverse

a verdict if the evidence cannot support it or if the nonmoving party has "failed to make a

showing on an essential element of his case with respect to which he had the burden of proof."

Price v. City of Charlotte, N.C., 93 F.3d 1241, 1249-50 (4th Cir. 1996) (quoting Bryan v. James

E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994)) (internal quotation marks

omitted).

8

With regards to liability, Architelos contends that Afilias failed to establish that the defendant's NameSentry product was "substantially derived" from Afilias' anti-abuse tool and was therefore a misappropriation of the alleged trade secrets contained in that tool, particularly because plaintiff's tool was only semi-automated, whereas NameSentry was fully automated, and because Afilias failed to present evidence of any algorithms related to its tool. JMOL Br. at 6-8. Architelos also argues that Afilias failed to establish that the allegedly misappropriated information was protectable as a trade secret because Afilias did not prove that the information derived economic value from not being known or readily ascertainable and Afilias did not show that it made reasonable efforts to maintain secrecy. Id. at 8, 13.

With respect to the known or readily ascertainable nature of the information, Architelos argues that Afilias failed to present any evidence that the information was not known in the domain abuse industry or was not readily ascertainable by those skilled in the field and that Afilias instead just pointed out the overlap or similarities between Afilias' tool and Architelos' product. Id. at 10-12. Architelos contends that this overlap fails to show any trade secret misappropriation because Aaron's testimony established that the information contained in that overlap was well-known in the industry and therefore was not trade secret material. Id. at 12-13. Architelos cites Trident Products and Services, LLC v. Canadian Soiless Wholesale, Ltd., 859 F. Supp. 2d 771 (E.D. Va. 2012) and Othentec, Ltd. v. Phelan, 526 F.3d 135 (4th Cir. 2008) to support its argument that even if there is some overlap between the Afilias tool and Architelos product, there is no misappropriation "if that overlap is not protectable as a trade secret." Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for J. as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [Dkt. No. 270] at 3, Sept. 24, 2015 ("JMOL Reply"). Architelos contends

that, having failed to present evidence on that issue, Afilias failed to establish that its information was protectable as a trade secret. Id.

Regarding reasonable efforts to maintain secrecy, Architelos argues that Afilias not only publicly disclosed its purported trade secrets when it filed an application for new TLDs, JMOL Br. at 14, and when it filed its '351 patent application, id. at 20, but that Afilias also allowed Aaron to keep its confidential information when it knew that Aaron was consulting with Architelos. Id. at 14. Architelos further faults Afilias for failing to take any "damage control measures" after discovering Aaron's purported misappropriation and argues that Afilias' failure to act allowed Architelos to innocently acquire the information. Id. at 14-15 (internal quotation marks omitted).

Afilias responds that the automation issue is irrelevant because trade secret misappropriation can be found even where the trade secret is modified or improved.[3] JMOL Opp'n at 5. Afilias further argues that it presented substantial evidence showing that NameSentry was derived from Afilias' trade secrets, particularly because Aaron was the lead developer both for Afilias' tool and for defendant's NameSentry product and because Aaron's testimony regarding the differences between the products was that of a discredited and interested witness. JMOL Opp'n at 3-6. Afilias also contends that it established that the trade secrets were not readily ascertainable by presenting (1) evidence of Afilias' time and effort spent developing the tool and (2) Dr. Nielsen's expert testimony that no parties in the industry other than Afilias and

---

[3] Afilias also contends that Architelos waived its argument that the trade secrets were readily ascertainable by failing to raise it in either of its oral Rule 50(a) motions during trial, JMOL Opp'n at 3; however, Architelos based those motions in part on an argument that Afilias did not identify its trade secrets and did not establish that the trade secrets were not publicly known or disclosed. Trial Tr. 495:4-7, 881:2-5. Although Architelos did not explicitly discuss whether the secrets were readily ascertainable, the reference to whether they were known or disclosed suffices to show that the argument was raised in the Rule 50(a) motions.

Architelos had this type of technology and that Architelos' use of the information in its patent applications shows a belief in its novelty. Id. at 9-12. Afilias further argues that although it publicly disclosed that it was taking certain anti-abuse measures, it did not disclose how those measures worked. Id. at 14. Architelos responds that Dr. Nielsen's testimony is irrelevant because he admitted on cross-examination that he had not considered the prior art in the field when evaluating the tool. JMOL Reply at 4. It also argues that any efforts to keep Afilias' tool a secret are irrelevant to whether the technology itself was readily ascertainable. Id.

Afilias has the stronger argument with respect to liability, particularly in light of the substantial burden a movant seeking judgment as a matter of law faces in overcoming a jury verdict. Moreover, Architelos' argument that evidence of efforts to guard secrecy or to develop the product is irrelevant is not sound. As plaintiff correctly argues, JMOL Opp'n at 9, "[p]recautions taken . . . to preserve the secrecy of the information," as well as evidence that "acquisition of the information through an examination of a competitor's product would be difficult, costly, or time-consuming," demonstrate that the product is not readily ascertainable by proper means. Restatement (Third) of Unfair Competition § 39 cmt. f (1995). Afilias presented expert testimony and other evidence demonstrating that NameSentry contains many of the same features as the Afilias anti-abuse tool, in addition to evidence showing the time and effort Afilias invested in developing its tool, and expert testimony that developing the Afilias tool would take time and experimenting "to figure out." See JMOL Opp'n Br. at 9-12.

Specifically, Afilias' Executive Vice President and Chief Technology Officer testified that it took Afilias two and a half years and approximately $1.5 million to develop a model of its anti-abuse tool, Trial Tr. 138:18-25, 141:14-18, and Afilias' expert Dr. Nielsen, who was qualified as an expert in computer network security, id. 354:2-12, concluded that the '801 patent

11

claims "represented the proprietary information developed at Afilias" and that proprietary information was also contained in the NameSentry product. Id. 384:22-24, 386:4-6. Dr. Nielsen further testified that no entity in the industry besides Afilias and Architelos had technology containing those proprietary elements, id. 386:12-18, and that the initial development of the semi-automated tool would require time and experimentation, unlike the additional steps needed to convert the tool to being fully automated. Id. 402:23-403:24. Afilias also presented evidence of the non-disclosure and confidentiality agreements it had employees sign in addition to other measures it took to protect the confidentiality of its information, id. 51:18-52:23, 217:6-223:17, as well as testimony that it did not initially realize the extent of Aaron's breach or know that Aaron was working on an anti-abuse project for Architelos. Id. 257:11-261:6.

Architelos did not call any expert witness to counter plaintiff's Dr. Nielsen. Instead, Architelos relied primarily on the testimony of Aaron to demonstrate that the products were different, even though Aaron was a witness who the jury was permitted to disbelieve because he had a personal interest in this litigation and because he was shown during cross-examination to have copied language from Afilias documents, including ones related to NameSentry. Id. 800:13-808:10. Although reasonable minds could disagree as to Aaron's credibility and the significance of that cross-examination, that determination was for the jury. Consequently, drawing all reasonable inferences in favor of the nonmovant and the jury's verdict, Architelos fails to demonstrate that a reasonable jury could only have decided against the plaintiff on the issue of liability.

### B. Judgment as a Matter of Law on Damages

Architelos argues that the amount of the jury verdict was not supported by the evidence and that it should receive judgment as a matter of law on that basis. JMOL Br. at 15.

12

Specifically, Architelos argues that the $10 million figure ultimately awarded by the jury could only have been based on the argument plaintiff's counsel made at the end of the trial and was never mentioned by any witness or supported by any properly admitted evidence. Id. at 15-17. Architelos further contends that Dr. Becker's expert testimony about a "hypothetical negotiation" ignored the reality that Architelos would not have been a willing buyer in 2011's uncertain market for new TLDs, that his reliance on a single sales projection by defendant ignored economic reality as well as the three-party agreement's provision for royalties based on actual profits, and that he failed to apportion the value of NameSentry according to those parts of it that were considered trade secrets.[4] Id. at 17-18. Last, Architelos argues that calculating a reasonable royalty or lump sum payment based on defendant's projected earnings was unfounded because the projections were speculative and untethered to the reality of the company's performance.[5] Id. at 19-20.

---

[4] Architelos also argues that Dr. Becker's testimony regarding a $48.8 million lump sum payment was unreliable because it was not included in his initial expert report, where he instead estimated a lump sum payment of $93,500, JMOL Br. at 20; however, Dr. Becker testified that he included the lump sum only in his rebuttal report because the defendant's damages expert's report (which was not presented at trial) raised the issue and Dr. Becker sought to respond to that expert's contentions. Trial Tr. 468:10-469:4. Moreover, Architelos does not demonstrate that this omission in the first report makes the second report so unreliable that the Court would have to grant judgment as a matter of law. Instead, Architelos seems to want to argue that $93,500 is the more appropriate figure for damages. That argument fails because it should have been presented to the jury at trial rather than to the Court on a Rule 50(b) motion.

[5] Defendant also argues that any verdict based on plaintiff's exhibit 463 ("PX-463"), which was incorrectly referred to by plaintiff's counsel during closing argument as PX-263, Trial Tr. 927:23-24, would be improper because it was not admitted into evidence. JMOL Br. at 18. The exhibit, a PowerPoint presentation containing Architelos sales projections that was purportedly shown to investors, see Trial Tr. 928:1-15, was shown to Aaron during his testimony at trial, but Aaron testified that he had not seen the document before and was not at the meeting where it was presented. Id. 798:14-799:7. Accordingly, the exhibit was not moved into evidence, but plaintiff's counsel referred to the document during his closing argument, when he argued that Architelos believed NameSentry was going to produce $105 million in revenue between 2013

Afilias counters that the $10 million award was properly based on a royalty rate applied

to Architelos' sales projections and was "within the range of the credited testimony, which

should not be reweighed." JMOL Opp'n at 17 (quoting United States v. Smoot Sand & Gravel

Corp., 248 F. 2d 822, 829 (4th Cir. 1957)) (internal quotation marks omitted). Afilias argues that

it presented evidence based on Architelos' own financial projections that would have supported a

verdict of up to $48.8 million, that Architelos waived any objection to the inclusion of this

evidence, that Dr. Becker's methods were proper and fully explained in his testimony, that the

contested exhibit PX-463 to which plaintiff's counsel referred in his closing argument is proper

evidence regardless of the lack of accompanying witness testimony, and that Architelos' failure

to obtain its projected revenues does not undermine the hypothetical negotiation analysis. Id. at

17-21.

Regardless of which exhibit or what testimony the jury relied upon in calculating

Architelos' future profits, plaintiff provided the jury with a large range of figures from which it

could calculate a damages amount. The range was supported by plaintiff's expert testimony and

by a number of exhibits, the authenticity and accuracy of which were essentially uncontested.

Moreover, Architelos did not present any contrary evidence or expert testimony on damages,

meaning the record contains only evidence supporting Afilias' estimations of the value of its

misappropriated information. Because the Court cannot reweigh that evidence on a Rule 50(b)

motion, the jury's award will not be overturned on defendant's motion for judgment as a matter

of law, and such motion has been denied in total.

---

and 2019. Id. 928:5-15. He then argued to the jury that it could discount that amount, and
described $10 million as a reasonable damages award. Id. 928:16-929:22.

## C. New Trial

Architelos argues that if judgment as a matter of law is not warranted, it is instead entitled to a new trial. Motions for a new trial under Fed. R. Civ. P. 59 are subject to a "significantly different" standard than Rule 50(b) motions because the court "must weigh the evidence and consider the credibility of the witnesses," and it has discretion to set aside the verdict if that testimony and evidence is insufficient to support the verdict. Bennett v. Fairfax Cnty., 432 F. Supp. 2d 596, 599 (E.D. Va. 2006). A court may grant a new trial, however, "only if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" Id. (quoting Lovell v. BBNT Solutions, LLC, 295 F. Supp. 2d 611, 618 (E.D. Va. 2003)). Furthermore, a court "must treat a jury's verdict with great deference and respect" and "must not set aside a verdict as either inadequate or excessive merely because the district court would have acted differently if it had been the trier of fact or because the jury could have come to a different conclusion that the trial judge feels was more reasonable." Stebbins v. Clark, 5 F. App'x 196, 202 (4th Cir. 2001).

When a party seeks a new trial on the basis of a purportedly excessive damages award, "a district court sitting in diversity must apply state law standards" to determine whether the verdict provides a basis for granting a new trial. Bennett v. R & L Carriers Shared Servs., LLC, 744 F. Supp. 2d 494, 532 (E.D. Va. 2010) (citing Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 438-39 (1996)). Virginia law permits a jury verdict to be overturned only if it "is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption, or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not

15

the product of a fair and impartial decision." Id. (quoting Rutherford v. Zearfoss, 272 S.E.2d 225, 227-28 (Va. 1980)) (internal quotation marks omitted).

Architelos contends that the jury award is against the clear weight of the evidence, is based on false evidence, and would result in a miscarriage of justice. JMOL Br. at 22. In response, Afilias argues that although the Court may now weigh the evidence and assess witness credibility, the Rule 59 motion fails for the same reasons that the Rule 50(b) motion does, and plaintiff's use of PX-463 does not constitute "false evidence." JMOL Opp'n at 23-25. Afilias further contends that the award is not a miscarriage of justice simply because Architelos will be unable to pay. Id. at 25-26.

Afilias has the better of the argument. Although the Court can weigh the evidence in deciding this motion, defendant has failed to identify any evidence in the record that rebuts the plaintiff's evidence at trial, making it difficult to find that the verdict is against the "clear weight" of the evidence. In particular, by failing to present any expert testimony to counter plaintiff's damages expert, defendant left itself vulnerable to a large damages award. There is also nothing in the record upon which to find that the verdict is based on false evidence.[6] Although Architelos' inability to pay the award and the disparity between the award and

---

[6] Architelos repeats its argument that the $10 million award is based on false or improper evidence because there was no witness testimony supporting exhibit PX-463 and the only source for that figure was plaintiff's closing argument. JMOL Br. at 22-23. Architelos does not provide any supporting authority for this argument that such evidence is improper or false, and Afilias correctly argues that there is no indication that the use of an exhibit during closing argument that was not properly admitted into evidence constitutes the type of "false evidence" that is grounds for overturning the verdict, particularly because Architelos itself produced the exhibit and because its use does not rise to the level of false testimony or a fraud on the court. JMOL Opp'n at 25 (citing Johnson v. Verisign, Inc., No. Civ.A.01-765-A, 2002 WL 1887527, at *12 (E.D. Va. Aug. 15, 2002)). Afilias also persuasively argues that Architelos failed to object to the use of PX-463 during closing argument and therefore waived its right to a new trial on this basis. Id.

Architelos' actual revenue and profits may indicate that there is a miscarriage of justice, that issue is properly addressed through remittitur rather than conducting a new trial.

Furthermore, although neither party discussed the relevant state law in detail, there is little here to suggest that the jury verdict was not the product of a "fair and impartial decision" or that it was influenced by "passion, corruption, or prejudice." Although the award may be out of proportion to the injuries suffered, it is supported by the plaintiff's unrebutted evidence, it is the amount suggested by plaintiff's counsel during closing argument as the reasonable amount needed to make his client whole, and it is far less than the $48.8 million calculated by plaintiff's expert.

Accordingly, the defendant's alternative motion under Rule 59 has been denied.

### D. Preemption

Architelos argues that the civil conspiracy and conversion claims are preempted under the VUTSA because those claims were entirely predicated on plaintiff's allegations of trade secret misappropriation, JMOL Br. at 26, while Afilias counters that the claims are not preempted because the jury may have awarded damages on those claims for misappropriation of proprietary information rather than trade secrets. JMOL Opp'n at 27-28.

The VUTSA "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret;" however, the statute "does not affect . . . [o]ther civil remedies that are not based upon misappropriation of a trade secret." Va. Code Ann. § 59.1-341(A); see also Trident Products & Servs., 859 F. Supp. 2d at 782. Because the statute "was intended to prevent inconsistent theories of relief for the same underlying harm," it only preempts alternative claims that are "premised entirely on a claim for the misappropriation of a trade secret." Smithfield Ham & Products Co., Inc. v. Portion Pac, Inc.,

905 F. Supp. 346, 348 (E.D. Va. 1995); see also E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc., 688 F. Supp. 2d 443, 451-52 (4th Cir. 2009). To avoid preemption, the alternative claims must state "distinct theories of relief" that are "supported by facts unrelated to the misappropriation of the trade secret" and that are sufficient to "state a claim absent the misappropriation allegations." Id. at 348-49.

Architelos argues that the plaintiff based its conversion and civil conspiracy claims entirely on trade secret misappropriation allegations and offered no other basis for those theories of recovery. JMOL Br. at 26. Architelos points to the Complaint's allegations that "[t]he confidential and trade secret information Defendants removed from Aflias' offices and computer networks . . . belongs to Afilias" and that "Defendants wrongfully converted Afilias' confidential information and trade secrets when each acquired, retained and used Afilias' confidential information and trade secrets" as indications that Afilias based these claims upon trade secret misappropriation. Id. (quoting Compl. ¶¶ 74-75) (internal quotation marks omitted). Similarly, the Complaint alleges that Architelos and the co-conspirators acted in furtherance of a civil conspiracy because they "used improper and unlawful means, including but not limited to acting in tortious interference of contract and in violation of the Virginia Uniform Trade Secrets Act." Compl. ¶ 78. Architelos argues that these allegations, as well as the evidence at trial, focused exclusively on alleged trade secrets, and that Afilias "did not present evidence . . . such that a distinct claim apart from the alleged [trade secret] misappropriation could stand on its own." JMOL Br. at 26-27.

Afilias argues that it "always maintained that Architelos misappropriated Afilias' non-trade secret, proprietary information, such as its approach to grouping customized abuse feed data . . . and the jury could have found . . . that the filtering system, while confidential, did not

18

rise to the level of a trade secret," leading it to provide a separate damages award for the conversion of that information. JMOL Opp'n at 29. Afilias also contends that Architelos "inflicted a separate injury" on Afilias by publishing Afilias trade secrets in its patent applications, an injury that permitted the jury to make a separate damages award for unjust enrichment gained through a civil conspiracy. Id. at 29-30. Additionally, Afilias focuses on the Court's instructions that the jury specify whether its damages awards were additive or for a separate injury. Id. at 30; see also Trial Tr. 995:25-997:18. Afilias argues that these "clarifying instructions addressed and cured any preemption issues." Id. In its reply, Architelos characterizes these arguments as speculative and therefore insufficient to show that the conversion and civil conspiracy claims are not preempted by the VUTSA. JMOL Reply at 9-10.

Architelos has the better of the argument. First, Afilias' argument that the Court addressed and resolved preemption is incorrect. The Court did not instruct the jury on preemption and instead regarded the issue as a matter of law unresolved by the jury's verdict. Trial Tr. 1009:5-8 (stating after the jury verdict was returned that the Court was "a little concerned about the preemption concept" and would be "looking for case law" on the issue). In fact, the conversion instruction repeated Afilias' allegation that Architelos converted both its confidential and trade secret information but did not explain to the jury that the conversion claim would be preempted if it found that the converted information qualified as trade secret material. See id. 972:5-11. Therefore, the jury's decision to award separate damages amounts for the conspiracy and conversion claims does not indicate that they found that non-trade secret information was the basis for those claims or that those claims could survive apart from Afilias' allegations regarding trade secrets.

19

Second, in its opposition brief Afilias makes contradictory arguments about what information it views as trade secret as opposed to merely confidential and fails to point to evidence it presented at trial that could support standalone claims for conversion and conspiracy. Afilias did not clearly specify during the trial or in its pleadings what aspects of its anti-abuse tool were trade secrets and what parts were simply confidential and proprietary. Instead, during closing arguments, plaintiff's counsel described conversion as "another way of saying something is taken. It's like if they took the trade secret, then they converted it." Id. 947:14-16. He also stated that the defendants "conspired to take our things," but did not specify whether those things were trade secrets or just confidential information. Id. 947:5-6. Although Afilias alleged conversion and conspiracy regarding both trade secret and non-trade secret information, indicating the possibility that the claims were not "entirely" predicated on trade secret misappropriation, Afilias made no attempt at trial to identify what constituted non-trade secret information.

Furthermore, in its opposition to defendant's motion, Afilias at one point states that information like the filtering system was a trade secret but then argues that the jury could have found that it was instead just confidential information. JMOL Opp'n at 29 ("Afilias presented evidence and argument that Architelos misappropriated Afilias' trade secrets, in the form of the many-to-one method and filtering system . . . Afilias always maintained that Architelos misappropriated Afilias' non-trade secret, proprietary information, such as its approach to grouping customized abuse feed data.").[7] This kind of "in the alternative" argument does not

---

[7] It is also unclear whether there is evidence to support Afilias' assertion that it had consistently characterized information, including its customized groupings of data feeds, as confidential proprietary information rather than trade secret information. Afilias does not provide any citation to the record to support this claim.

demonstrate that the conversion and conspiracy claims involved "distinct theories of relief" or that they are supported by sufficient facts unrelated to the misappropriation allegations. See Smithfield, 905 F. Supp. at 348-49. Instead, the record supports the conclusion that the conspiracy and conversion claims were likely premised on the trade secret misappropriation allegations and were intended to serve as a backstop for those allegations. Because those allegations were resolved by the jury's finding of trade secret misappropriation, the jury's verdict as to Counts Nine and Ten was preempted by the jury's trade secret misappropriation finding, and the $5 million in damages awarded for those claims must be set aside.

### E. Remittitur

Architelos argues that if judgment as a matter of law or a new trial is not warranted, then the Court should remit the damages award because the jury verdict will otherwise result in a miscarriage of justice. A court must "require a remittitur or order a new trial" if it determines that a jury verdict is excessive. Bennett, 432 F. Supp. 2d at 599 (quoting Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 305 (4th Cir. 1998)) (internal quotation marks omitted). Although the Federal Rules of Civil Procedure do not specifically provide for remittitur, "it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice." Id. The "federal standards developed under Rule 59" also govern this inquiry. Gasperini, 518 U.S. at 435 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989)) (internal quotation marks omitted). Like a Rule 59 determination, the decision whether to reduce a jury verdict is a discretionary one. Bennett, 432 F. Supp. 2d at 600 (citing Robles v. Prince George's Cnty., MD, 302 F.3d 262, 271 (4th Cir. 2002)).

Both parties raise largely the same arguments regarding remittitur as they do with respect to defendant's Rule 50(b) and Rule 59 motions. In addition to those arguments, Afilias contends

21

that Architelos cannot now argue that a damages award of $93,500 would be more appropriate

when it did not make that argument or present evidence supporting it at trial, JMOL Opp'n at 26,

while Architelos argues that the absence of evidence of willful or malicious action on its part,

combined with its efforts to add value to the NameSentry product, makes the award excessive.

JMOL Reply at 8-9. Architelos further asserts that Afilias "seeks far more than compensation"

and that it "would be totally unjust to allow Afilias to destroy Architelos" through a jury award

that is out of proportion to the injury suffered by Afilias. Id. at 9.

The multi-million dollar disconnect between Architelos' projections and its actual

revenue and profits does indicate that the jury award here is excessive. That gap is also reflected

in the difference between Afilias' research and development costs and the profits made by

Architelos on the NameSentry product, because Afilias spent $1.3 to $1.5 million on developing

its anti-abuse tool, while Architelos has obtained less than $300,000 in revenue from

NameSentry in the roughly four years it has offered the product. In addition, as discussed above,

although preemption under the VUTSA eliminates half of the damages award, the remaining $5

million awarded for the misappropriation claim is still excessive when considered in the context

of plaintiff's damages and defendant's actual profits. Because it is within the court's sound

discretion to reduce this award, defendant's motion for remittitur has been granted. A number

closer to the actual loss shown by Afilias—namely, its $1.3 to 1.5 million investment in research

and development, in addition to the $300,000 in revenue Architelos gained from NameSentry—

would be more proportional and better rooted in the evidence presented at trial. Accordingly, the

judgment has been remitted to the amount of $2 million.

## IV.   CONCLUSION

For the reasons stated in open court, as more fully developed in this Memorandum Opinion, the Defendant's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur has been granted only to the extent that the judgment has been remitted to $2 million. This Memorandum Opinion accompanies the Order issued by this Court on January 8, 2016.

Entered this 23 day of March, 2016.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

23